The first question to be considered in this case is the alleged want of legal right and competency of the plaintiffs individually, or collectively, to institute this suit and stand in judgment.
If that question can be solved in plaintiffs' favor, then the only remaining question is whether the verdict of the jury against the defendant should be sustained, increased, or reduced in amount.
The object of the suit is to compel the defendant to render an account and to pay over certain funds or the profits received by him from a ball given in the city of New Orleans on February 24, 1922, known as the French Opera Trades Ball, for the purpose of raising moneys to be used for the rebuilding of the *Page 84 
French opera house which was destroyed by fire some years ago.
The plaintiffs are seven of the leading ladies of this city who have been very active in all civic, social, artistic, and other like movements for the benefit and advancement of the city.
They sue in their individual names and as constituting the executive committee of the French Opera Trades Ball.
The defendant in his answer admits that he has in his possession a certain amount of funds the proceeds from the said ball, and he admits that the said funds do not belong to him.
He specially denies the legal right of the plaintiffs, and their capacity, to sue to compel him to account for the said funds or to pay over to them the money in his possession.
The case was tried by a jury prayed for by the defendant and which rendered a verdict against him for $4,629.98.
The plaintiffs have answered the appeal and pray that the judgment be increased to the sum of $5,592.18.
Some time in the summer of 1921 the defendant, a resident of this city, and who styles himself as the leading and progressive impresario of the city, invited a number of the leading and enterprising ladies of the city to a luncheon given by him at Antoines restaurant. At the conclusion of the luncheon the subject of rebuilding the old opera house was brought up and discussed, but no definite plans at that time were formulated. Subsequent meetings were had at which many of the ladies of the city were present.
It was finally agreed that a ball should be given, to be known as the French Opera Trades Ball. The petitioners herein were selected as the executive committee and administrative head of the enterprise. Mrs. George B. Penrose was made executive chairman, and the defendant was made secretary treasurer.
After this committee was agreed upon the *Page 85 
question of the defendant's commission became a subject of much discussion. He informed the committee that he expected to retain for his services one-fourth of the gross receipts of the ball out of which he would pay all expenses.
Some of the members of the committee protested and threatened to resign and have nothing further to do with the matter. The defendant finally agreed that he would give his services gratis.
It was agreed between the committee and the defendant that all receipts from the ball should be deposited in a special account in the Canal-Commercial Trust Savings Bank, under the name of "Rebuilding Fund French Opera House," against which checks were authorized to be paid only when signed by Mrs. Penrose, executive chairman, and the defendant, as treasurer.
The trades ball was given at the Athenæum on the date previously stated, and as asserted by the plaintiffs was a complete social and financial success. The defendant, however, claims that the ball was a complete social and financial failure.
But be that as it may, the defendant admits that the sums collected by him or which came into his possession from subscriptions from merchants, donations, price of boxes, and sale of tickets amounted to $7,616.75. Instead of depositing the said funds in the special account as he had agreed with the committee should be done, he made the deposits in his own name and drew against it at his own will and pleasure and without consulting Mrs. Penrose, chairman, or any member of the committee.
The plaintiffs repeatedly called upon the defendant to furnish a statement of the amounts he had received and of the bills for expenses he claimed to have paid, but he declined to furnish such a statement.
It was only after suit was threatened against him that he prepared and caused to be published what he styled a provisional *Page 86 
statement, which showed in lump sums, receipts amounting to $7,616.75 and disbursements of $4,562.10, leaving a balance in his hands of $2,304.65.
On the trial of the case after being pressed to state where he kept this money, after much evasion, he stated that the money was in a safe in his house. Thereupon a judicial sequestration was issued, but the sheriff failed to get the money or to find the safe referred to.
The defendant admitted on the witness stand that he left the city to avoid service of the sequestration and that he sent the money out of the state and beyond the process of the court.
We have not undertaken to state the facts in detail, but the foregoing contains a fair statement of the salient and important facts disclosed by the pleadings and the evidence.
The defendant claims that it was his ball; that he had full charge of the affairs and administration of the ball; that he appointed the chairman of all committees, who were to report to him; that he fixed the prices of seats and boxes and the minimum for the King and Queen; that all receipts were to be under his control and disposition, with no obligation to account to any one.
That the plaintiffs constituted a self-styled committee, an honorary title given to the ladies as a mere matter of form, without any authority or executive control over the ball or the funds derived therefrom whatever.
It is asking too much of the court to believe the contention of the defendant in this respect, in the light of the evidence in the record and his conduct as disclosed by the record.
It is incredible that the ladies who gave their time and service in making the ball a success would have left the exclusive control and management to the defendant with the right to make such disposition of the funds derived from the ball as he saw fit.
If the ladies, without whose active management *Page 87 
the ball would never have been held, had had any reason to suspect that the defendant was going to assume the attitude which he now takes, they most assuredly would never have consented to head or even to take part in the enterprise in connection with the defendant.
The exception of the want of interest and legal authority to bring this suit is based upon the theory that there is no such legal entity as that of executive committee of the French Opera Trades Ball and that there were a number of committees besides the plaintiff committee; that there were about 200 ladies who took part in the ball; and that the plaintiffs could not sue without making all who took part in the ball in any capacity parties to the suit.
It is well settled, and indeed our Code (article 446) provides, that corporations unauthorized by law enjoy no public character and cannot appear in a court of justice, but in the individual name of all the members who compose it and not as a political body.
In the instant case there is no pretense that the executive committee composed of the plaintiffs is a legal entity or body politic in law, nor does it sue as such. The petition alleges that the plaintiffs compose the executive committee, and the evidence shows that they were agreed on and appointed as such executive committee.
And the defendant himself does not deny this fact, but merely claims that the committee was appointed by him and was subordinate in authority to him.
There is nothing to show that any other persons than the plaintiffs were members of this particular committee. There were many other ladies who took an active part in the giving of the ball and raising funds for the rebuilding of the opera house, and they are, no doubt, entitled to equal credit with the plaintiffs, but it cannot be said that all who took part in the enterprise were members of *Page 88 
the executive committee in charge of the affair and should have joined in the suit.
If the executive committee is to be regarded as an unincorporated association, then such association has the right to sue and stand in judgment provided the individuals who compose the association join in the suit. Such is undoubtedly the law and is sustained by the authorities cited by defendant's counsel.
It is provided in the Code, cited, supra, that unincorporated associations may acquire and possess estates and have common interest as well as other private societies, from which it follows that the individuals who compose such societies or unincorporated associations can sue to protect their interest or the common interest of all.
5 Corpus Juris, p. 1368, lays down the rule that an action may be brought by one or more of the members of an unincorporated association for the benefit of all, where the members have a common or general interest in the subject-matter of the suit, or where the members are numerous and it is impracticable to bring them all before the court, since those who sue may fairly be presumed to represent the rights and interest of the whole.
This principle was recognized in Beatty and Ritchie v. Kurtz, 2 Pet. 585, 7 L. Ed. 528, wherein the Supreme Court of the United States said:
 "The only difficulty is whether the plaintiffs have shown in themselves a sufficient authority, since it is not evidenced by any formal vote or writing. If it were necessary to decide the case on this point, we should incline to think that under all the circumstances it might be fairly presumed. But it is not necessary to decide the case on this point; because we think it one of those cases in which certain persons belonging to a voluntary society, and having a common interest, may sue in behalf of themselves and others having the like interest as part of the same society for purposes common to all and beneficial to all."
The plaintiffs in this suit unquestionably have an interest in common with all who took *Page 89 
part in the raising of the funds which the defendant has essayed to treat as his own, in seeing that such funds are preserved from wrongful appropriation and spoliation and to be ultimately applied to the purposes for which such funds were contributed by the public.
The defendant agreed in advance on the purpose for which said ball was given and agreed that the fund so obtained should be deposited in a certain bank to the credit of such fund.
It comes with very bad grace, after he has come into possession of said fund, to endeavor to shield himself behind a supposed legal technicality that no one has the authority in law to force him to turn over the said fund, to be applied in the manner intended, and to which he consented.
Our conclusion is that the plaintiffs have an interest and standing in court to recover from the defendant the trust fund which he illegally and unjustly withholds from its proper application and intended dedication.
On the question of the amount for which defendant should be held to account, we have carefully examined the evidence and do not feel justified in increasing the amount. Nor do we think it should be reduced. The verdict of the jury appears to be sustained by the evidence.
For the reasons assigned, the judgment appealed from is affirmed.